TORRUELLA, Circuit Judge.
This case involves regulation of one of New England’s most famed resources: the American lobster. Despite the lobster’s somewhat other-worldly appearance with its protruding eyes, spindly legs, and oversized claws, its meat is highly valued by epicures across the country, making the lobster fishery one of the most competitive and valuable fisheries in North America. As a result of this competition, however, American lobsters along the Atlantic Coast are overfished, jeopardizing the sustenance of the fishery. In an effort to conserve the lobster population, and pursuant to statutory authority, the Secretary of Commerce promulgated regulations that, inter alia, limited the number of lobster traps permitted per fishing vessel. Lobster fishermen who reside in and whose vessels are based in Rhode Island brought suit challenging the Secretary’s regulations on various grounds. Both parties moved for summary judgment. Adopting the magistrate judge’s report and recommendation, the district court granted summary judgment for the Secretary of Commerce. The lobster fishermen instituted this appeal. Because we find that the district court erred in granting summary judgment for the Secretary, we reverse.
I.
Before delving into the merits, we first address the relevant regulatory history and the factual and procedural background of this case, so as to provide a context for the fishermen’s claims advanced on appeal.
A. Statutory Background
1. The Magnuson-Stevens Fishery Conservation and Management Act
Congress enacted the Magnuson-Ste-vens Fishery Conservation and Management Act (“Magnuson-Stevens Act”), 16 U.S.C. §§ 1801 et seq., in 1976 to, inter alia, “take immediate action to conserve and manage the fishery resources found off the coasts of the United States.” 16 U.S.C. § 1801(b)(1). Pursuant to this goal, the Magnuson-Stevens Act established an exclusive economic zone (“EEZ”), covering the waters 3 to 200 miles offshore of the United States,[1] over which the federal government claims “sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources” located therein. Id. § 1811. To implement conservation measures within the EEZ, the Magnuson-Stevens Act *111 directs the establishment of regional fishery management councils to prepare, monitor, and revise fishery management plans, “which will achieve and maintain, on a continuing basis, the optimum yield from each fisher.” Id. § 1801(b)(4). The regional fishery management councils are designed to “enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of such [fishery management] plans” and to “take into account the social and economic needs of the States.” Id. § 1801(b)(5).
Under this authority, Congress created eight regional fishery management councils (collectively “Regional Councils”), composed of state fishery officials, the National Marine Fisheries Service (“NMFS”) regional director, and qualified individuals who are “knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned.” Id. § 1852. A Regional Council’s primary function is, for each fishery under its authority that requires conservation measures, to prepare a fishery management plan (“FMP”) that establishes guidelines over the fishery and meets the conservation goals set forth in the Act. Id. § 1852(h)(1). These FMPs are prepared in response to the Secretary finding that a fishery is overfished, see id. § 1854(e)(1), and requesting conservation measures, see id. § 1854(e)(2). The Regional Council then submits the FMP to the Secretary of Commerce (“Secretary”) for review. Id. § 1852(h)(1). If the FMP is approved, the Secretary is then responsible for enacting implementing regulations. 16 U.S.C. § 1854.
In sum, “[t]he Magnuson-Stevens Act’s main thrust is to conserve the fisheries as a continuing resource through a mixed federal-state regime; the FMPs are proposed by state Councils but the final regulations are promulgated by the Secretary through the Fisheries Service.” Mass. v. Daley, 170 F.3d 23, 27-28 (1st Cir.1999).
2. The Atlantic Coastal Fisheries Cooperative Management Act
The Atlantic Coastal Fisheries Cooperative Management Act (“ACFCMA” or “Atlantic Coastal Act”), 16 U.S.C. §§ 5101 et seq., was enacted in 1993 in response to Congress’ concern over “disparate, inconsistent, and intermittent State and Federal regulation that has been detrimental to the conservation” of Atlantic Coastal fishery resources. Id. § 5101(a)(3). The Atlantic Coastal Act was passed “to support and encourage the development, implementation, and enforcement of effective interstate conservation and management” of the fisheries along the Atlantic Coast. Id. § 5101(b).
Pursuant to this purpose, the ACFCMA created a new management regime, wherein:
The responsibility for managing Atlantic coastal fisheries rests with the States, which carry out a cooperative program of fishery oversight and management through the Atlantic States Marine Fisheries Commission. It is the responsibility of the Federal Government to support such cooperative interstate management of coastal fishery resources.
Id. § 5101(a)(4). The Atlantic States Marine Fisheries Commission (“Atlantic States Commission” or “ASMFC”) is composed of representatives from the states along the Atlantic Coast from Maine to Florida, as well as from the District of Columbia. Id. § 5102(3), (13); Pub.L. No. 77-539, 56 Stat. 267 (1942); Pub.L. No. 81-721, 64 Stat. 467 (1950).
Under the Atlantic Coastal Act, the Atlantic States Commission is responsible for *112 preparing and adopting a coastal fishery management plan (“CMP”), 16 U.S.C. § 5104(a)(1), the equivalent of the Magnu-son-Stevens Act’s FMP, for coastal fishery resources, which are defined as any fisheries that move among jurisdictional waters of two or more states or one state and the EEZ, id. § 5102(2). The ASMFC, in preparing CMPs, “shall consult with appropriate [Regional] Councils to determine areas where such coastal fishery management plan may complement Council fishery management plans.” Id. § 5104(a)(1).
While the focus of the Atlantic Coastal Act is on state waters and coordinating plans among the coastal states and Regional Councils, the Act addresses federal and state cooperation in coastal fisheries management by providing for the development of federal regulations to support the ASMFC’s coastal fisheries management efforts. See id. § 5103. Accordingly, the Act provides that, “[i]n the absence of an approved and implemented” FMP under the Magnuson-Stevens Act, and “after consultation with the appropriate [Regional] Councils, the Secretary may implement regulations to govern fishing” in the EEZ, provided that such regulations are compatible with the CMP and are consistent with the national standards of the Magnuson-Stevens Act. Id. § 5103(b)(1).
B. Factual Background
1. The American Lobster Fishery and Initial Conservation Efforts
American lobsters are found in coastal waters ranging from Maine to North Carolina. Although NMFS has estimated that about eighty percent of the American lobster population is located in the nearshore area (i.e., within three miles of the coast, and therefore subject to state management), the remaining twenty percent are found in the EEZ. The vast majority of lobsters are fished using lobster traps; only a few percent of those fished are caught using trawls, gillnets, dredges, or by divers.
Federal management of the American lobster began in 1978 when NMFS and the states of Maine, New Hampshire, Rhode Island, Massachusetts, Connecticut, New York, Pennsylvania, Delaware, Maryland, Virginia, and North Carolina developed a FMP pursuant to the Magnuson-Stevens Act. This effort resulted in the adoption and implementation of an Interstate Fishery Management Plan (“ISFMP”) for state and federal waters. In 1983, the New England Fishery Management Council (“NEFMC”), one of the eight Regional Councils established by the Magnuson-Stevens Act, produced, and NMFS implemented, a FMP for the American lobster fishery based on the ISFMP. Despite these conservation measures, the 1993 annual report of the Northeast Stock Assessment Workshop revealed that the American lobster stock was overfished.[2] The increase in fishing mortality rates was attributed to increased lobster trap fishing. In 1996, a panel of independent stock assessment experts echoed the 1993 findings that the American lobster was overfished and made recommendations to curb the problem.
As a result of these studies, NMFS was concerned that the current federal conservation measures under the Magnuson-Ste-vens Act were insufficient to protect the lobster fishery. Thus, on March 27, 1996, *113 NMFS proposed withdrawing the lobster FMP as inconsistent with the national standards of the Magnuson-Stevens Act and issuing new regulations under the Atlantic Coastal Act. This suggestion prompted the development of Amendment 3 to the ISFMP and the rulemaking that is challenged in this appeal.
2. Amendment 3 to the ISFMP
Pursuant to its authority under the Atlantic Coastal Act, the Atlantic States Commission developed and adopted Amendment 8 to the ISFMP in December 1997. Among other measures, Amendment 3 included the following provision, limiting the number of traps per vessel allowed in the offshore region of “Area 3”:
3.3.3.1 Limits on the number of traps per vessel
In Area 3, the Lobster Conservation Management Team, constituted under Section 3.4, shall develop a program to cap and then reduce effort, based upon historical participation, vessel size or other relevant criteria, for the purpose of achieving the egg production rebuilding schedule of Section 2.5. The program may recommend alternative measures, besides effort control, that would achieve stock rebuilding targets. The program shall be presented to the ASMFC Lobster Management Board prior to July 1, 1998; and be designed for implementation effective January 1, 1999. If a program is not forthcoming, a limit of 2,000 traps shall be implemented on January 1, 1999.
Thus, although Amendment 3 contained a trap limit, this limit was only to take effect if the Area 3 Lobster Conservation Management Team (“LCMT”)[3] failed to recommend alternative conservation measures by July 1, 1998.
Meanwhile, on March 17, 1998, NMFS issued a Draft Environmental Impact Statement (“DEIS”) pursuant to the National Environmental Policy Act (“NEPA”), 42 U.S.C. §§ 4321 et seq., to evaluate alternative conservation measures for federal waters that would be compatible with those under Amendment 3. The DEIS considered a number of alternatives, including implementing Amendment 3’s trap limit and regulating offshore fishing based on historic participation. As required under NEPA, NMFS requested public comments on the alternatives in the DEIS.
On July 29, 1998, almost one month after the deadline announced by Amendment 3, the Area 3 LCMT submitted its plan to the Atlantic States Commission’s Lobster Management Board. The LCMT’s plan provided for trap limits based on historical participation in the lobster fishery. The Lobster Technical Committee approved the plan and forwarded it to the Lobster Management Board. The Atlantic States Commission then began consideration of the LCMT plan in April and May 1999, with plans to finish its assessment by December 1999.
3. NMFS’ Continued Rulemaking Under the Atlantic Coastal Act
While the LCMT was developing its recommendation to the Atlantic States Commission, NMFS continued its efforts to develop regulations governing the EEZ *114 that would be compatible with the measures applicable to state waters and recommended for federal waters under Amendment 3. On January 15, 1999, after consideration of the public comments received on its DEIS, NMFS published its proposed rule in the Federal Register.
The proposed rule recommended setting trap limits of 2,000 in 1999 and 1,800 in 2000 for the offshore area. As the Area 3 LCMT plan had not yet been approved by the Atlantic States Commission at this time, NMFS did not include the historic participation plan in its proposed rule. The public comment period for the proposed rule ran from January 11, 1999 to February 26,1999.
On May 10, 1999, NMFS published the Final Environmental Impact Statement (“FEIS”). At this time, the Atlantic States Commission had just completed public hearings on the LCMT plan, but had still not yet approved the plan.
4. Adoption of the LCMT Plan and NMFS’ Second Rulemaking
On August 3, 1999, more than one year after the deadline set out in Amendment 3, the Atlantic States Commission finally approved the LCMT plan for trap limits based on historic participation and recommended that NMFS implement the substance of the LCMT plan.
Based on this recommendation, NMFS promulgated a notice of new proposed rulemaking on September 1, 1999, which included the possibility that future conservation measures could be based in part on historical participation in the lobster fishery. While NMFS began this new separate rulemaking process based on historic participation it simultaneously continued the rulemaking process establishing flat trap limits pursuant to the Atlantic States Commission’s recommendations in Amendment 3.[4]
5. NMFS’ Final Rule and On-going Rulemaking on the LCMT Plan
On December 6, 1999, NMFS published the final rule withdrawing the FMP for the American lobster and establishing federal regulations under the Atlantic Coastal Act, which included the flat trap limit set forth in the proposed rule. These regulations were scheduled to take effect on May 1, 2000. The relevant part of the promulgated regulations concerning offshore Area 3 provide:
§ 697.19 Trap limits and trap tag requirements for vessels fishing with traps.
(b) Trap limits for vessels fishing or authorized to fish in the EEZ Offshore Management Area.
(1) Beginning January 5, 2000, through April 30, 2000, vessels fishing only EEZ Offshore Management Area 3, or, fishing only EEZ Offshore Management Area 3 and the Area 2/3 Overlap, shall not fish with, deploy in, possess in, or haul back from such area more than 2,000 traps.
(2) Beginning May 1, 2000, vessels fishing only in or issued a management area designation certificate or valid lim *115 ited access American lobster permit specifying only EEZ Offshore Management Area 3, or, specifying only EEZ Offshore Management Area 8 and the Area 2/3 Overlap, shall not fish with, deploy in, possess in, or haul back from such area more than 1,800 traps.
50 C.F.R. § 697.19.
Despite this final rule, NMFS indicated that it was still pursuing the LCMT plan under a separate on-going rulemaking process. Accordingly, on December 10, 1999, NMFS published a' Notice of Intent to Prepare an Environmental Impact Statement for the LCMT plan and requested written comments. NMFS also published a supplemental DEIS and held public hearings in four states. As a result of the comment process, on January 3, 2002, NMFS issued a proposed rule based on the LCMT’s historic participation plan. If this proposed rule were adopted, it would replace the trap limit set forth in the final rule that is challenged in this appeal.[5]
C. Procedural Background
Plaintiffs-appellants in the three underlying consolidated cases are American lobster fishermen and lobster business owners or shareholders, who all reside in or whose vessels are berthed in Rhode Island. On January 4 and 5, 2000, the three sets of plaintiffs filed complaints in the United States District Court for the District of Rhode Island, challenging the Secretary of Commerce’s promulgation of the December 6, 1999 final rule imposing the trap limits. Plaintiffs asserted that the final rule violates the Administrative Procedure Act (“APA”), 5 U.S.C. §§ 701 et seq., various provisions of the Atlantic Coastal Act, the Magnuson-Stevens Act, and the Regulatory Flexibility Act (“RFA”), 5 U.S.C. §§ 601 et seq. Plaintiffs sought a declaratory judgment that the final rule was arbitrary and capricious and specific relief ordering .the Secretary to implement a trap limit regulation based on historic participation.
After the defendant, the Secretary of Commerce, filed his answer on April 11, 2000, the plaintiffs filed a consolidated motion for summary judgment on October 20, 2000. The Secretary filed an opposition motion and a. cross-motion for summary judgment. , The district court then referred the case to a magistrate judge for preliminary review, findings, and recommended disposition. On May 4, 2001, after a hearing on the cross-motions for summary judgment, the magistrate judge issued a Report and Recommendation to the district court recommending that the court grant the Secretary’s motion for summary judgment and deny the plaintiffs’ motion. Plaintiffs' filed timely objections to the magistrate judge’s report.
On August 7, 2001, the district court accepted the magistrate judge’s report and recommendation and granted summary judgment in favor of the Secretary in the three consolidated cases. On September 6, 2001, plaintiffs in one of the three underlying suits, Campanale & Sons, Inc., C.E.H., Inc., and Narrangansett Seahawk, Inc. (collectively ^appellants”), filed a notice of appeal from the district court’s final judgment. Appellants seek review of only four of the claims that viere presented to the district court: (1) the Atlantic Coastal Act’s “consultation” requirement; (2) com- *116 pbance with the Magnuson-Stevens Act’s national standard 2; (3) compliance with national standard 8; and (4) alleged violation of the RFA.
II.
This Court reviews de novo a district court’s grant of summary judgment. See Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104,109 (1st Cir.1997). In this case, since appellants allege violations of the Atlantic Coastal Act, the precise standard of review is provided by the APA, 5 U.S.C. §§ 701 et seq. See Dubois v. United States Dep’t of Agric., 102 F.3d 1273, 1284 (1st Cir.1996) (applying APA standard of review to agency action under federal statute which does not itself specify a standard of review); see also 16 U.S.C. §§ 5101 et seq. (not discussing judicial review for ACFCMA).
Under the APA’s standard of review, this Court can set aside agency action only if we determine such action to be “arbitrary, capricious, an abuse of discretion,” or “without observance of procedure required by law,” or otherwise contrary to law. See 5 U.S.C. § 706(2)(A)-(D); see also Associated Fisheries, 127 F.3d at 109. When the issue is whether the agency followed the requisite legal procedure, our review is limited, but exacting. See Natural Res. Def. Council, Inc. v. Sec. & Exch. Comm’n, 606 F.2d 1031, 1045, 1048-49 (D.C.Cir.1979). We review only to determine whether “statutorily prescribed procedures have been followed.” Id. at 1045. Thus, despite applying a de novo standard, our review is narrow. See id.; see also Mass. v. Daley, 170 F.3d 23, 28 (1st Cir.1999) (“[N]ominally reviewing the decision de novo but effectively reviewing the Secretary’s action under the APA”).
In exercising our review of the district court’s grant of summary judgment for defendant, we determine whether the summary judgment record shows that there is no genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. See Fed. R.Civ.P. 56(c). In so doing, we must view the record evidence in the light most favorable to the non-moving party. See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir.2000).
III.
Appellants assert that the district court erred in concluding that the Secretary satisfied the “consultation” requirement of the Atlantic Coastal Act. The Atlantic Coastal Act, in relevant part, provides, “[i]n the absence of an approved and implemented fishery management plan under the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.), and after consultation until the appropriate Councils, the Secretary may implement regulations to govern fishing in the exclusive economic zone,” as long as such regulations are “compatible with the effective implementation of a coastal fishery management plan” and “consistent with the national standards” of the Magnuson-Stevens Act. 16 U.S.C. § 5103(b)(1) (emphasis added).[6] The ACFCMA does not define “consultation.”[7]
*117 Appellants contend that the “after consultation with the appropriate Councils” language requires the Secretary (or NMFS, as his designee) to consult with the relevant Regional Councils, the New England Fishery Management Council (“NEFMC”) and the Mid-Atlantic Fishery Management Council (“MAFMC”), before he is permitted to implement regulations affecting the EEZ under the Atlantic Coastal Act. As a result, appellants assert that issuing regulations without first consulting these councils constitutes an agency action “without observance of procedure required by law,” 5 U.S.C. § 706(2)(D), warranting the regulations to be set aside. Although appellants concede that the administrative record contains some correspondence between these councils and NMFS, appellants argue that these letters were merely part of the public comment process for agency rulemaking and did not constitute “consultation” within the meaning of the Atlantic Coastal Act. Moreover, appellants assert that any correspondence that did occur between the councils and the Secretary was insufficient for consultation because it occurred after the Secretary had already made decisions and recommendations regarding the regulations.
The district court, rejecting the appellants’ argument that the Secretary implemented regulations without “consultation,” granted summary judgment in favor of the defendant. The court found that there was “sufficient evidence in the Record that NEFMC and MAFMC gave their opinions or at least were afforded the opportunity by NMFS to give their opinions on the proposed regulations.” Ace Lobster Co., Inc. v. Evans, 165 F.Supp.2d 148, 172 (D.R.I.2001). The evidence relied upon by the court was the following: the FEIS was sent- to the Executive Directors of NEFMC and MAFMC; NMFS received public comments on the DEIS, some of which were from NEFMC and MAFMC; and five comments on the DEIS were authored in part by the NEFMC, to which NMFS responded directly. Id. at 171. The court bolstered its conclusion that this correspondence satisfied the consultation requirement by reasoning that “the underlying statutory ideology of the ACFC-MA — that of state-influenced management of the lobster resource supported by the Federal government — is not offended by the perhaps less than exhaustive ‘consultation’ with NEFMC and MAFMC (neither of which are state-managed bodies).” Id. at 172. We disagree with the court’s conclusion that the evidence, viewed in the light most favorable to' appellants, sufficiently demonstrated consultation so as to warrant summary judgment.
Our general rules of statutory interpretation dictate a narrow course for us on review: unless the statutory language is ambiguous, we generally are limited by its plain meaning. See Herman v. Héctor I. Nieves Transp., Inc., 244 F.3d 32, 34 (1st Cir.2001); see also Boivin v. Black, 225 F.3d 36, 40 (1st Cir.2000) (“We assume that the words that Congress chose to implement its wishes, if not specifically defined, carry their ordinary meaning and accurately express Congress’ intent.”). In this case, there is no ambiguity: “consultation” means what consultation ordinarily means. See Black’s Law Dictionary 311 (7th ed.1999) (defining consultation as “[t]he act of asking the advice or opinion of someone”).
The gravamen of the district court’s error in finding sufficient evidence of “consultation” is that it relied solely upon cor *118 respondence that was part of a general public comment process statutorily required by NEPA, rather than by the ACFCMA. See 42 U.S.C. § 4332 (requiring environmental impact statements to accompany “every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment” and to be made available to the public). Thus, the cited correspondence between NMFS and NEFMC or MAFMC did not differ from NMFS’ correspondence with the general public. Under NEPA, the FEIS was required to be made available to the public at large, so the fact that NEFMC and MAFMC were provided with a copy was simply part of this obligation. Moreover, when NEFMC and MAFMC proffered public comments to the DEIS, they were acting no differently than other members of the public who are given an opportunity to respond to environmental impact statements under NEPA. Consultation, within the parameters of the Atlantic Coastal Act, must mean something more than general participation in the public comment process on environmental impact statements, otherwise the consultation requirement would be rendered nugatory.[8] See Hector I. Nieves Tramp., 244 F.3d at 36 (“A primary canon of statutory construction is that a statute should be construed so as not to render any of its phrases superfluous.”).
The Secretary, anticipating this argument, counters that commentary by NEFMC or MAFMC, made as part of the NEPA process, can still constitute consultation under the Atlantic Coastal Act. The Secretary contends that the ACFCMA “does not require that [ ] consultation occur through a distinct process or provide that it cannot be combined with other statutory or regulatory processes.” Although the Secretary offers no legal support for this proposition, we agree with the Secretary’s position as a theoretical matter; in some circumstances, consultation that occurs pursuant to NEPA’s requirements may also fulfill the Atlantic Coastal Act’s requirement of consultation.[9] However, this is not such a case.
Here, the comments made pursuant to NEPA and upon which the district court relied are insufficient to satisfy the ACFC-MA’s consultation requirement. NEPA was created, in part, “to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man.” 42 U.S.C. § 4321 (establishing congressional purpose of NEPA). In view of this goal, NEPA requires that the public be given an opportunity for public comment, see 42 U.S.C. § 4332, to help ensure that the government is aware of and has considered all significant environmental effects in formulating its proposed action. Cf. Conservation Law Found., Inc. v. Busey, 79 F.3d 1250, 1271 (1st Cir.1996) (commenting that NEPA is designed to force government decision makers to consider environmental *119 impact); Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1021 (9th Cir.1980) (noting purpose of input under NEPA is “to further the statutory purpose of encouraging widespread discussion and consideration of the environmental risks and remedies associated with the pending project.”).
The ACFCMA, however, is more specifically designed “to support and encourage the development, implementation, and enforcement of effective interstate conservation and management of Atlantic coastal fishery resources.” 16 U.S.C. § 5101(b). Although in some circumstances the goals of preventing environmental damage under NEPA and conserving Atlantic coastal fishery resources under the ACFCMA may coalesce, they are not always synonymous. As a result, public comments made by one of the Regional Councils in response to an environmental impact statement under NEPA may not raise the same issues that the same council would raise when consulting with the Secretary under the ACFCMA about proposed regulations governing fishing in the EEZ. Thus, without notice to the NEFMC or MAFMC that the Secretary was intending to use their comments to the DEIS or FEIS to fulfill the consultation requirement of the ACFCMA, the councils may not have appropriately tailored their environmental comments to correspond with advice they would have offered the Secretary under the ACFCMA.[10] In this case, the Secretary did not provide any such notice to the Regional Councils. Thus, it was inappropriate for the district court to rely on the DEIS/FEIS public comments as showing that NEFMC and MAFMC “were afforded the opportunity by NMFS to give their opinions on the proposed regulations.” Although the councils were given the opportunity to offer their environmental assessments of the proposed regulations, the documents relied upon by the district court do not demonstrate that NMFS solicited the councils’ advice regarding the soundness of the regulations for conserving Atlantic Coastal fishery resources.[11]
However, even if the district court erred in relying on the environmental impact statement commentary as sufficient evidence of consultation, we can still affirm the district court’s judgment if there are other grounds evident in the record to support the court’s finding of consultation. See Houlton Citizens’ Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir.1999). The Secretary points to a number of documents as supporting his claim that NMFS properly consulted NEFMC and MAFMC.[12] While some of these docu *120 ments do show correspondence between NMFS and NEFMC and/or MAFMC, many involve general discussions about management of the lobster fishery rather than specific views about the proposed conservation measures for the EEZ. Moreover, although the administrative record arguably does indicate that NMFS kept NEFMC informed of its intent to withdraw the lobster FMP and instead regulate under the Atlantic Coastal Act, NMFS never requested NEFMC’s or MAFMC’s opinion or advice regarding this intent, but merely stated that NMFS “will keep [NEFMC] informed.” The Secretary does not proffer any evidence in the administrative record where NMFS affirmatively solicits advice or an opinion from the Regional Councils regarding its proposed regulations.[13]
Even after our independent review of the lengthy administrative record in this case, we are unable to find any evidence that NMFS “ask[ed] the advice or opinion” of NEFMC or MAFMC, or afforded them a proper opportunity to express their opinions, regarding the proposed rule. Although we agree with the district court that ACFCMA “is not offended by ... perhaps less than exhaustive ‘consultation’ with NEFMC and MAFMC,” there must be some effort by NMFS to receive the councils’ views regarding proposed regulations over Atlantic Coastal fishery resources and then consider such advice. Consultation with the relevant councils is key in the Secretary’s development of effective regulations because the councils have valuable expertise and insight. See 16 U.S.C. §§ 1852(h)(3) (requiring the councils to conduct public hearings “to allow all interested persons an opportunity to be heard in the development of fishery management plans”), 1852(h)(5) (requiring councils to review and revise assessments of the optimum yield from each fishery), 1852(b)(2)(A) (requiring that council members be qualified by expertise regarding conservation and management of fishery resources). Without some communication between NMFS and the councils to elicit such expertise, the consultation requirement is meaningless.[14]
*121 We rule that there is insufficient evidence in the record to show that the Secretary complied with Congress’ explicit procedural requirement to consult with the appropriate councils before implementing regulations governing fishing in the EEZ. Thus, we reverse the district court’s grant of summary judgment for defendant and remand for further proceedings consistent with this opinion.[15]
IV.
Because we find that the summary judgment record on the consultation issue, viewed in the light most favorable to appellants, does not support judgment as a matter of law for defendant, we reverse and remand the case for further proceedings consistent with this opinion.

. The area within three miles of shore is regulated by tire individual states bordering that territory.

. “Overfishing” or "overfished” is defined as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis.” 16 U.S.C. § 1802(29). In the lobster fishing context, overfishing occurs when the mortality rate results in an estimated egg production per lobster that is less than 10 percent of what it would be in a non-fished population.

. The Area 3 Lobster Conservation Management Team was created by Amendment 3 to make recommendations on conservation measures for Area 3 to the Atlantic States Commission. Any recommendations would then be reviewed by the Commission's Lobster Management Board, and then by the Commission's Lobster Technical Committee, provided that such recommendations were submitted prior to the July 1, 1998 deadline specified in Section 3.3.3.1 of Amendment 3.

. NMFS opted not to include the LCMT plan in the rulemaking process that it had already begun because it would have had to start the rulemaking process afresh, meaning that no plan would be able to go into effect until this new process was completed. The course of the rulemaking for this process was estimated by the defendant-appellee to last one to two years. NMFS stated that "continued delay for full consideration of the LCMT plans until a date yet to be determined by the Atlantic States Commission jeopardizes needed management measures to protect the lobster resource.”

. The fact that the Secretary is currently promulgating a rule that follows the recommendation of the Council does not mean that he followed the proper procedure for the rule that is subject to litigation. It actually might show prejudice, because if the Secretary had consulted with the councils regarding the litigated rule, perhaps he never would have passed it, but instead would have adopted a historic participation model as he is doing now.

. We note that the Atlantic Coastal Act, a specific law, overrides a more general law such as the APA.

. The dissent analogizes to other cases in which we have held that the National Historic Preservation Act and NEPA require only that the agency be informed of and consider various alternative positions. Those statutes, however, lack the specific consultation language found in the Atlantic Coastal Act. The Atlantic Coastal Act requires the Secretary to consult with the Regional Councils because *117 they are presumed to have expertise that the Secretary does not. It therefore makes sense to impose a greater duty of consultation in these cases because the Secretary may not otherwise be fully informed.

. There is no evidence to support the dissent's view that the consultation language is simply meant as a "fail-safe.” Where the statutory language is clear, it is not the role of the judiciary to substitute its judgment for that of Congress. Here, Congress specifically inserted a requirement to consult with the Agencies. If Congress so intended, it could have easily explained that this consultation was only necessary if the Secretary was not required to release an EIS under NEPA.

. Contrary to the dissent’s assertion, we do not claim that the requirements under NEPA and the Atlantic Coastal Act are redundant. We agree that in some situations the two can be handled together. Here, however, additional consultation was required by the Atlantic Coastal Act, the paramount applicable statute.

.We are not engrafting a notice requirement onto the ACFCMA. Rather, we are suggesting that the Secretary might satisfy both NEPA and the Atlantic Coastal Act by providing notice that the DEIS is meant to elicit all comments from the councils.

. Furthermore, while the Secretary may have been aware that the councils preferred trap limits based on historic participation, there is no evidence that NMFS understood the reasons for this preference.

. The dissent finds that nine documents between NMFS and the New England Council demonstrate sufficient consultation for purposes of the Atlantic Coastal Act. We find this evidence insufficient.
Items 1-4, 5 and 7 concern discussions of the FMP that was in place until March 1996. The Council was fighting to maintain the existing FMP, while NMFS proposed to amend or withdraw it. Item 8 simply alerted the Council that NMFS would withdraw the FMP and proceed under the Atlantic Coastal Act.
Item 6 references a meeting regarding a "stock assessment” and the biology and productivity of American lobster. There is nothing to suggest this meeting discussed the FMP or any new regulations.
Thus, until March 1996, all relevant discussion had concerned whether to amend the *120 FMP or withdraw it. No alternative regulations had been proposed. These general correspondence are not applicable to whether or not NMFS consulted with the Council before implementing the challenged rule. It was not until NMFS announced that the FMP would be withdrawn and regulations would be imposed under the Atlantic Coastal Act that the Act, and its consultation requirement, even came into play.
The first time NMFS announced its proposed alternatives was in the DEIS, released March 17, 1998. Item 9 is the Council's response to the publicly released DEIS, and the first time the Council expressed its preference for a historic participation model. This public commentary is the only possible "consultation” because it is the only time the Council was responding to specific proposed regulations.

. This court has the discretion to consider the issue of harmlessness sua sponte and to overlook the parties’ failure to argue it. See United States v. Shea, 159 F.3d 37, 40 (1st Cir.1998). However, we do not believe that this case is an appropriate one in which to exercise that discretion. The harmlessness inquiry here is a factual one, and one we think best undertaken initially by the district court.

. The dissent argues that "at least some deference is owed the agency's view that it has engaged in consultation [because] Congress has left it to the Secretary to reasonably construe 'consultation' [and] deference is also owed agencies due to their 'specialized experience.' " These statements, although correct as generalities, hardly fit the circumstances of this appeal. We are unaware of any line of cases that allows an agency to make a binding determination that it has complied with specific requirements of the law. Although the agency can in the first instance conclude that it has engaged in consultation, this self-serving conclusion cannot be the end of judicial inquiry if a party properly makes a challenge, *121 as has happened in this case. See 5 U.S.C. § 706 (providing for judicial review of agency actions). As to the so-called “specialized experience” of the agency, it would appear that it is the courts that qualify for such a title on an issue of legislative interpretation. Interpretation of the word "consult" is purely a legal question for the courts. See 5 U.S.C. § 706 ("the reviewing court shall decide all relevant questions of law [and] interpret ... statutory provisions”). Using traditional methods of statutory construction, we hold that the agency did not adequately consult with the Councils, as required by statute. Such a legal determination does not require deference to the agency. See INS v.Cardoza-Fonseca, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); accord Grinspoon v. Drug Enforcement Admin., 828 F.2d 881, 885 (1st Cir.1987) (interpreting a statute without deference to the agency’s interpretation).

. Because we reverse summary judgment on the consultation issue, which may be determinative of whether the regulations will be set aside under 5 U.S.C. § 706(2)(D), we need not address the appellants’ remaining claims.