Brian M. ROCHE, Plaintiff

v.

Donald EVANS, Secretary of the United States Department of Commerce; and Scott B. Gudes, Acting Under Secretary for Oceans and Atmosphere/Administrator and Deputy Under–Secretary, Defendants

No. CIV.A. 02–10018–GAO.

United States District Court,
D. Massachusetts.

March 10, 2003.

Stephen M. Ouellette, Cianciulli & Ouellette, Beverly, MA, for Brian M. Roche, Plaintiff.

Ruth Ann Lowery, Camilla E. Boyle, U.S. Department of Justice, Environment and Natural, Resources Division, Wildlife and Marine, Resources Section, Washington, DC, for Donald Evans, Secretary of the United States Department of Commerce, Scott B. Gudes, Acting Under Secretary for Oceans and Atmosphere/Administrator and Deputy Under Secretary, Defendants.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

The plaintiff, Brian M. Roche, an inshore fisherman and the owner and master of the F/V HIGH FLYER, a fixed-gear fishing vessel, was fined by the National Oceanic and Atmospheric Administration ("NOAA"), an agency within the United States Department of Commerce, for entering an area closed to fishing under pertinent regulations. By this action, authorized by 16 U.S.C. § 1858(b),[1] Roche seeks

---

1. The plaintiff mistakenly asserts that authority for this action is granted by 16 U.S.C. § 1855(f). That section authorizes judicial review of regulations adopted by the Secretary of Commerce, or certain other actions taken by him, in accordance with standards applicable under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Petitions for review under § 1855(f) must be filed "within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." 16 U.S.C.

review of the imposition of the civil penalty. He advances several reasons: (1) the regulations he was found to have violated were not properly adopted, (2) there was not substantial evidence in the record to establish the violations, (3) the regulations were enforced in a manner that amounted to an abuse of discretion, and (4) the fine imposed, even if lawfully assessed, was excessive. Both the plaintiff and the defendants have moved the Court for summary judgment. For the reasons stated below, the plaintiff's motion is denied and the defendants' motion is granted.

## I. The Regulatory Regime

By the Magnuson–Stevens Fishery Conservation and Management Act (the "Magnuson–Stevens Act" or simply the "Act"), 16 U.S.C. § 1801 *et seq.*, the Secretary of Commerce is directed to approve, implement, and enforce fishery management plans "to prevent overfishing, and to protect, restore, and promote the long-term health and stability" of American fisheries. *Id.* § 1853(a)(1)(A). The Act established eight regional fishery management councils with the responsibility, and with broad discretion, to develop and recommend fishery management plans for their respective regions. §§ 1852, 1801(b)(5). One of these, the New England Fishery Management Council (the "Council"), has authority over fisheries in the Atlantic Ocean seaward of the States of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut, including the area pertinent to this case, referred to as the Western Gulf of Maine. § 1852(a)(1).

The Council developed, and the Secretary adopted, an initial Northeast Multispecies Fisheries Management Plan (the "FMP") in 1985. Since then, the FMP has been amended several times. In 1996, with the population of cod in the Gulf of Maine on the verge of collapse, the Council adopted Amendment 7 to the FMP, which placed controls on fishing vessel trips, implemented closures of certain fishing areas, and—of significance for this case— established a procedure, more abbreviated than formal rule-making procedures otherwise applicable, for making changes, adjustments or additions to the FMP as necessary to achieve the FMP's goals and objectives. *See* 61 Fed.Reg. 27710 (May 31, 1996).

The adjustment procedures added by Amendment 7, referred to as "framework specifications," are codified at 50 C.F.R. § 648.90. Two methods are provided. First, there are provisions for an annual review of "[c]atch and landings, [Days–at–Sea], and other measures of fishing effort, survey results, stock status, current estimates of fishing mortality, and any other relevant information," *id.* § 648.90(a)(1), for the purpose of "recommend[ing] target [Total Allowable Catches or 'TACs'] and develop[ing] options necessary to achieve the FMP goals and objectives." § 648.90(a)(2).

The regulation sets out a timetable for the annual review. The regional Multispecies Monitoring Committee is to meet by November 15 each year and, after conducting the required review, make recommendations for consideration by the Council. The Council may then make recommenda-

§ 1855(f)(1). In contrast, § 1858(b) permits a person against whom a civil penalty is assessed to "obtain review thereof in the United States district court for the appropriate district by filing a complaint against the Secretary in such court within 30 days from the date of such order." *Id.* U.S.C. § 1858(b).

The imposition of the penalty in this case became final on December 5, 2001, when the plaintiff's request for discretionary review of the decision of the Administrative Law Judge (the "ALJ") was denied. This action was filed January 4, 2002, and thus was timely commenced under § 1858(b).

tions to the Secretary, through its Regional Administrator, for changes or adjustments—called "framework adjustments"—to the existing FMP. There are two alternative timetables for this to be done. If the Council submits a recommendation to the Regional Administrator by the next January 7, and the Regional Administrator concurs in the recommendation, it will be published as a *proposed rule* in the Federal Register, with a 30–day period for public comment following publication. Alternately, the Council may instead submit its recommendation to the Regional Administrator by February 1 and request that the Regional Administrator publish the recommendation as a *final rule*. § 648.90(a)(5). This alternative is available if the Council follows the framework process outlined in § 648.90(b).

Under that second process,

the Council shall develop and analyze appropriate management actions over the span of at least two Council meetings. The Council shall provide the public with advance notice of the availability of both the proposals and the analyses and opportunity to comment on them prior to and at the second Council meeting.

§ 648.90(b)(1)(i). After "developing management actions and receiving public testimony," the Council may make a recommendation to the Regional Administrator for the issuance of a final rule. If the Regional Administrator concurs, the recommendation will be published as a final rule in the Federal Register. § 648.90(b)(4)(i). Alternately, the Regional Administrator may cause the recommendation to be published as a proposed rule with an additional period for public comment, § 648.90(b)(4)(ii), or he may reject the Council's recommendation, § 648.90(b)(4)(iii).

In late 1997 and early 1998, following this "framework adjustment" procedure set out in § 648.90(b), the Council adopted an adjustment to the existing FMP identified as "Framework 25." Among other things, Framework 25 mandated that certain fishing areas would be closed to fishing for varying lengths of time. *See* 63 Fed.Reg. 15326 (March 31, 1998). In particular, a certain part of the Western Gulf of Maine was closed to fishing for the period May 1, 1998 through April 30, 1999. 50 C.F.R. § 648.81(n)(1) (1998). It is unlawful for a person to "[e]nter, be on a fishing vessel in, or fail to remove gear from" such a closed area. § 648.14(a)(52). Violation of the regulation subjects the violator to a civil penalty. 16 U.S.C. §§ 1857(1)(A), 1858(a).

## II. *Proceedings under Review*

On February 1, 1999, Coast Guard officers of the U.S.C.G. Cutter WRANGELL came upon and boarded the F/V HIGH FLYER approximately two and one-half miles inside the closed area of the Western Gulf of Maine. Roche was the master of the vessel at the time. On May 10, 2000, the National Marine Fisheries Service ("NMFS"), a division of NOAA and thus of the Department of Commerce, issued a "Notice of Violation and Assessment of Administrative Penalty" to Roche for violation of 50 C.F.R. §§ 648.14(a)(52) and 648.81(i), assessing a penalty in the amount of $35,000. At Roche's request, an evidentiary hearing was held before an Administrative Law Judge ("ALJ"). The ALJ found that Roche had entered the closed area, though he also noted that the government's assertion that Roche had been fishing within the area had not been proven. After considering Roche's financial status and the particular circumstances of his violation, the ALJ reduced Roche's fine from $35,000 to $20,000. Thereafter, Roche requested a discretion-

ary review of the ALJ's decision by the Administrator of NOAA, but his request was denied. He then brought this action to review the assessment of the penalty.

## III. *Consideration of Roche's Arguments*

As noted above, Roche makes several arguments in support of his plea that the penalty assessment be set aside or reduced. They are addressed in turn.

### A. *Invalidity of the Closure Regulations Adopted as Framework 25*

Roche contends that Framework 25 was not validly adopted because the defendants failed to comply with certain statutory requirements.[2] His principal argument in this respect is that the defendants failed to comply with mandated public notice requirements concerning the Council's consideration of a framework adjustment.

The Council was authorized by the regulations implemented by the adoption of Amendment 7 to

> develop and analyze appropriate management actions over the span of at least two Council meetings. The Council shall provide the public with advance notice of the availability of both the proposals and the analyses and opportunity

**2.** Because the defendants concede that the plaintiff may challenge the validity of the regulations as a defense to the enforcement action, it is not necessary to decide that question. *See Fishing Co. of Alaska v. United States,* 195 F.Supp.2d 1239, 1246–47 (W.D.Wash.2002) (permitting collateral attack on validity of regulations) and cases there cited. *But see* Frederick Davis, *Judicial Review of Rulemaking: New Patterns and New Problems,* 1981 Duke L.J. 279, 279–89 (1981) (discussing question generally and with respect to particular statutes).

**3.** A prior action in this Court involved a claim for judicial review of the adoption of Frame-

to comment on them prior to and at the second Council meeting.

50 C.F.R. § 648.90(b)(1)(i)(1997).

Consistently with this provision, the Council considered the adoption of Framework 25 "over the span" of two meetings, held December 9–11, 1997, and January 13–15, 1998. There is no genuine dispute between the parties, and the administrative record[3] supports the conclusion, that there was ample notice and opportunity for public comment on the proposed Framework 25 "prior to and at" the second meeting. The plaintiff's argument concerns the adequacy of notice of the agenda of the December Council meeting.

Specifically, he asserts that the Council failed to give notice of its December meeting that conformed to the following provision of the Magnuson–Stevens Act:

> Timely public notice of each regular meeting and each emergency meeting, including the time, place, and agenda of the meeting, shall be published in local newspapers in the major fishing ports of the region ... and such notice may be given by such other means as will result in wide publicity. Timely notice of each regular meeting shall also be published in the Federal Register. The published agenda of the meeting may not be modified to include additional matters for

work 25 under 16 U.S.C. § 1855(f), but that action was dismissed as moot because, while it was pending, Framework 25 was superseded by a successor framework. *See Gulf of Maine Fisherman's Alliance v. Daley,* 292 F.3d 84 (1st Cir.2002). The parties here agreed that the Court could take notice of the administrative record filed in the prior case, Docket No. 98–10744–GAO. That administrative record is cited herein as "AR(GMFA)" to distinguish it from the administrative record of the penalty enforcement proceedings directly under review in this case, which is cited simply as "AR."

Council action without public notice or within 14 days prior to the meeting date, unless such modification is to address an emergency action under section 1855[(c)] of this title, in which case public notice shall be given immediately. 16 U.S.C. § 1852(i)(2)(C). Two types of notice of the time, place, and agenda of a regular Council meeting are mandated by this provision: publication in the local newspapers of "the major fishing ports" of the region, and publication in the Federal Register. In addition, the Council may also choose to give notice by other means likely to result in "wide publicity." In addition to the kinds of notice required, the statute also forbids any change in the published agenda less than fourteen days prior to the meeting, unless the change relates to an emergency matter. The plaintiff argues that this should be understood to mandate that the required notices must be given more than fourteen days prior to the meeting.

This is what the Council did to give notice of the December meeting. It mailed a notice of the meeting, including its agenda, to about 1,650 recipients (identified from previous participation or interest in Council matters) by bulk mail on November 19, 1997. There was evidence that some unknown quantity of these notices were delayed and that some intended recipients did not receive the mailed notice until the actual day of the hearing. There was also evidence that other recipients received the mailed notice before the meeting. The Council also published notice of the meeting and its agenda in the Federal Register. The record indicates that the notice was submitted for publication on November 24, more than fourteen days prior to the meeting, although it was not published in the Federal Register until November 28 (the Friday after Thanksgiving), less than fourteen days prior to the meeting. In addition, the Council issued

press releases on December 2, 1997, a week before the meeting, outlining the findings of the Multispecies Monitoring Committee and noting, summarily, that "the status of these and other groundfish species managed under the FMP will be discussed publicly on the first day of the Council's December 9–11 meeting in Peabody, MA." AR(GMFA), Ex. 22. It did not cause any formal notice of the meeting or its agenda to be published in any newspaper.

It is evident that the Council's notice of the December 9 meeting did not fully conform to the notice requirements set forth in § 1852(i)(2)(C). The obvious variance is that the Council did not publish a notice in the local newspapers of the major ports of the region. Further, if the plaintiff is right that the restriction on changes to the agenda within fourteen days of the beginning of the meeting implies that "timely notice" under the statute must be notice given more than fourteen days before the meeting, then the Federal Register notice was also·non-conforming on that account. On the other hand, since the bulk mailing was discretionary, deficiencies in the delivery of notice sent by that method did not amount to a failure to comply with the statutory directive.

The defendants argue that the notice requirements of § 1852(i)(2)(C) do not apply to a framework adjustment. Rather, they contend, the Council was only bound to follow the procedures set forth in the regulations governing framework adjustments. There, it is simply required that the Council "provide the public with advance notice" of the proposed adjustment and the data on which its development was based and an opportunity to comment "prior to and at the second Council meeting," which in this case was the January 1998 meeting. The Council did "provide the

public with advance notice" of both meetings, the defendants say, and thus satisfied the only notice obligation they were bound to observe.

There is nothing in the regulation they rely on, however, that expressly relieves them of the need to comply with § 1852(i)(2)(C), and there is no inconsistency between the regulation and the statute that would prevent compliance with both. On the contrary, it is possible to construe the provisions together: the "advance notice" called for under the regulation is notice given in accordance with the statutory directive.

■ The defendants' other objection to the plaintiff's defective notice argument is that, even if there was non-compliance with the statutory notice requirement, the failure was minor and did not affect anyone's substantial rights; it was, in other words, "harmless." On this point, the defendants are correct.

As an adjustment to the FMP, Framework 25 did not come out of the blue, but rather arose from the extended course of measuring and evaluating the effectiveness of various means incorporated in the FMP for regulating the health of the fish stocks in the region's ocean fisheries. In the summer of 1997, data was available indicating that cod stocks in the Gulf of Maine were continuing to decline despite the various conservation measures undertaken to that point. At its July 1997 meeting, the Council discussed the possibility of ordering closures of various fishing areas, including the Western Gulf of Maine. AR(GMFA), Ex. 10. In September 1997, NMFS submitted a report to Congress on the status of United States fisheries that, among many other things, identified Gulf

of Maine cod as "overfished." The report concluded: "Based on the identifications made in this report, the Councils are now required to develop programs to end overfishing and rebuild . . . overfished stocks." AR(GMFA), Ex. 16, Report to Congress, at 4.

The Council discussed the NMFS report at its October public meeting, and the agenda for its November public meeting included "discussion and possible action" on "a strategy to address overfished groundfish stocks listed in the NMFS report." AR(GMFA), Ex. 17. In fact, the first item on the agenda for the November meeting was discussion of an "implementation plan to address Sustainable Fisheries Act[4] requirements and the thirteen overfished stocks recently identified" in the NMFS report. *Id.*

Throughout this time, in addition to Council meetings, there were meetings of various related committees and subcommittees, including the Multispecies Monitoring Committee, which issued in early December a report detailing the current status of Gulf of Maine cod stocks and proposing for discussion eight different options for potential action. The Committee's report was discussed at the December Council meeting, and formed the basis for the formulation of the adjustment ultimately adopted in Framework 25.

As this brief history indicates, well before the December Council meeting, persons interested in the FMP, including representatives of the fishing industry, were well aware that the Council was undertaking to consider a framework adjustment to the plan. More particularly, information publicly available indicated that a likely measure would involve closure of fishing areas, including the Western Gulf of

---

4. The Magnuson–Stevens Act is sometimes referred to as the "Sustainable Fisheries Act," after the public law enacted in 1996 that amended certain provisions of the Magnuson–Stevens Act. *See* Pub.L. No. 104–297.

Maine, for some period of time. A conclusion is simply not warranted that the failure of formal notice of the December Council meeting to conform to the prescription of § 1852(i)(2)(C) had any substantial effect on the opportunity for public comment on or participation in the framework adjustment process that led ultimately to the adoption of Framework 25. When a court reviews agency action, "[d]ue account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706(2). That is to say, a minor oversight should not become "the basis for overturning a decision properly made after an otherwise exhaustive proceeding." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Riverbend Farms v. Madigan*, 958 F.2d 1479, 1487–88 (9th Cir.1992) (harmless error in agency's failure to follow APA notice-and-comment procedures, where orange farmers had notice and participated in regulatory meetings). There is no justification in the record for a determination that Framework 25 is invalid because of defects in the notice of the December meeting.

■ The plaintiff also makes a substantive attack on Framework 25, claiming that the Council failed in its obligation to satisfy several of the "national standards" that must be followed in adopting an amendment to an FMP, specifically those requiring that fishery conservation and management measures: (a) not discriminate between residents of different states (National Standard 4); (b) consider the adverse impacts on affected communities (National Standard 8); and (c) promote the safety of human life at sea (National Standard 10). 16 U.S.C. § 1851(a).

According to the plaintiff, Framework 25 violated National Standard 4 because the framework's conservation measures disproportionately affected the inshore segment of the fleet and smaller shoreline communities.[5] On their face, of course, the management measures are neutral in that they impose uniform regulatory requirements without any distinction based on port (or State) of origin. Furthermore, the record demonstrates that the Council recognized the problem that vessels from nearby ports would be most disadvantaged by the conservation measures. Conscious of this issue, before voting to adopt Framework 25, the Council carefully considered other available options. In addition to studying the Multispecies Monitoring Committee's report, which evaluated the effects of the closure measures upon different ports, the record contains a number of other reviews that included consideration of the issues mandated by National Standard 4. After careful evaluation of the impact of closures upon local fishermen, the Council selected the conservation options believed to offer the greatest opportunity both for inshore vessels to fish and depleted stocks to repopulate.

In sum, the record shows that the defendants weighed the disparate impact that Gulf of Maine closures would have upon inshore fishermen, but ultimately determined that these inshore-area closures were necessary to allow the cod stocks to revive. In a similar case, the Ninth Circuit determined that even when a conservation measure results in some discrimina-

---

**5.** The plaintiff reasons that most inshore vessels fishing in the Gulf of Maine would originate from nearby ports (located in the New England States), whereas many offshore vessels, capable of navigating the deeper seas, would originate from ports in more distantly-located States. Consequently, a fishing management plan, like Framework 25, that closes fishing areas accessible to inshore vessels, would impose greater economic losses upon local, inshore fishermen than upon out-of-state, offshore fishermen.

tory impacts, the Secretary is permitted "to sacrifice the interests of some groups of fishermen, for the benefit as the Secretary sees it of the fishery as a whole." *Alliance Against IFQs v. Brown,* 84 F.3d 343, 350 (9th Cir.1996). In adopting Framework 25, the defendants adequately considered National Standard 4.

■ The plaintiff also claims that the Council failed to conduct an adequate economic analysis of the impact of Framework 25 on the inshore vessels and thereby failed to satisfy National Standard 8, which requires the Secretary to minimize the adverse economic effect of the conservation plan on local communities to the extent practicable. The record, however, indicates that the Secretary did consider the importance of fishery resources to the economic well-being of local communities and attempted through Framework 25 to mitigate the adverse consequences of its conservation measures as much as practicable. As noted above, there were extensive analyses performed prior to the adoption of Framework 25, including consideration of the adverse economic impacts of closing certain areas of the Gulf of Maine to cod fishing. There was both an economic analysis of the impact of Framework 25 on small businesses as required by the Magnuson–Stevens Act and a Regulatory Impact Review as mandated by Executive Order 12866. *See* AR(GMFA), Ex. 74. It is clear from the record that the Council considered but rejected the possibility of completely closing all cod areas, and instead implemented "rolling closures" of inshore areas for sequential one-month periods. The year round closure of the Western Gulf of Maine was, in context, relatively limited in area. Most of the inshore grounds were permitted to be open eleven months of the year. Though the Council recognized that the closures would cause nega-

tive short-term economic consequences to communities, the Council, and ultimately the Secretary, balanced those impacts against the congressional mandate to rebuild the fishing stock and achieve sustainability. The record demonstrates that the defendants were aware of the economic impact of the closures on local inshore fishermen, but nonetheless concluded that the closures were necessary to prevent depleted cod stocks from being completely devastated. Framework 25 was designed to meet both the short- and long-term economic needs of local inshore fishermen in the Gulf of Maine and was promulgated in accordance with National Standard 8.

■ The plaintiff further argues that the defendants, in adopting Framework 25, failed to adhere to National Standard 10, which requires the Secretary to adopt conservation measures that promote the safety of human life at sea. According to the plaintiff, one result of closing inshore fisheries is that inshore vessels, in an effort to survive financially, must venture farther offshore to fish. Inshore vessels are not generally designed for deep sea conditions, so when they fish in the offshore areas, their crews are exposed to greater danger. The record indicates that the defendants selected a conservation plan that would minimize the closure of inshore grounds, and thus permit vessels to fish in the inshore areas as much as possible while allowing devastated fish stocks to repopulate, thus reducing, consistent with the need to accommodate other goals, any incentive for fishermen to put their lives in danger by fishing beyond the limits of safety. The Secretary adequately considered National Standard 10 in adopting Framework 25.

It must be remembered that while the National Standards describe factors that the Secretary is obligated to consider

when developing fishing conservation and management regulations, the Secretary is nonetheless expected to exercise discretion in incorporating these standards into fishing management plans. The standards necessarily must be balanced against each other and against the Act's overarching mandate to protect the nation's marine resources. *Alliance Against IFQs*, 84 F.3d at 350. Framework 25 is not invalid for failure to give adequate consideration to National Standards 4, 8, or 10.

■ Finally, Roche argues that Framework 25 is invalid because it was not promulgated in accordance with the Regulatory Flexibility Act ("RFA"), which requires federal agencies to prepare initial and final regulatory flexibility analyses to assess the impact of proposed regulations on small businesses. *See* 5 U.S.C. § 601 *et seq.* He is wrong. In the first place, the RFA does not apply to the adoption of a framework adjustment to an FMP. By its terms, the statute applies "[w]henever an agency is required … to publish [a] general notice of proposed rulemaking for any proposed rule," *id.* § 603(a), or "[w]hen an agency promulgates a final rule … after being required … to publish a general notice of proposed rulemaking," *id.* § 604(a). Under the abbreviated framework adjustment procedure permitted under 50 C.F.R. § 648.90, there is no requirement that the Council "publish a general notice of proposed rulemaking." Indeed, the whole purpose of the framework adjustment procedure is to dispense with that requirement. *See Conservation Law Found. v. United States Dep't of Commerce*, 229 F.Supp.2d 29, 32 (D.Mass.2002). The predicate for application of the RFA to the process is thus lacking. In any event, the analysis that was conducted was sufficient to comply with the substantive obligations imposed under the RFA, were it to apply.

*See, e.g.*, the Regulatory Impact Review Clearance, AR(GMFA), Ex. 74.

**B.** *Substantial Evidence in Support of the Finding of a Violation*

■ In addition to his collateral attack upon the validity of Framework 25, Roche also argues that the finding that he violated applicable regulations by entering a closed fishing area is not supported by substantial evidence in the record. *See* 16 U.S.C. § 1858(b); 5 U.S.C. § 706(2). Under the familiar standard, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Penobscot Air Servs., Ltd. v. Fed. Aviation Admin.*, 164 F.3d 713, 718 (1st Cir.1999) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

■ There is no doubt that the Coast Guard found Roche captaining his vessel within a closed area and thus there can be no dispute that he had "entered" the closed zone in violation of 50 C.F.R. §§ 648.14(a)(52) and 648.81(i). Roche's objection is that the ALJ concluded that he had not *intentionally* entered the closed area. He is right as to what the ALJ found, but wrong when he suggests that proof of liability for violation of the regulations demands proof of intent. As a general matter, proof of either scienter or *mens rea* is not required to justify the imposition of a civil penalty unless the regulation at issue specifically makes such proof an element of the violation. *Northern Wind, Inc. v. Daley*, 200 F.3d 13, 19 (1st Cir.1999). A person is strictly liable for violation of conservation-related regulations adopted under the Magnuson–Stevens Act. *Id.* Accordingly, Roche is strictly liable to a civil penalty for entering the closed area, without proof of intent that he knowingly or intentionally violated the proscription.

It is also clear that the ALJ's finding that Roche did not qualify for an exception to the regulations—permitting vessels to transit closed areas if their gear is stowed, 50 C.F.R. § 648.81(d)—was supported by testimony given at the hearing. While it might have been possible for the ALJ to have made other findings, the findings he did make were clearly supported by the evidence before him.

### C. *Relief from Arbitrary and Capricious Enforcement*

The ALJ found that on the day of the violation, while Roche was at sea outside any closed area, he discovered some fixed fishing gear that belonged to him and that had previously been set. When Roche began hauling in the discovered gear, it appeared that some of it was missing. After a search, he eventually found what he believed to be the remaining gear. The ALJ found:

> [Roche] and his crew then commenced hauling in the gear, which they found to be tangled ... keeping the vessel barely underway to avoid the tangling of net in the propeller. While hauling the tangled gear, the vessel entered the Western Gulf of Maine Closed Area.

AR, Ex. 36 at 2.

Thus, Roche argues, the only reason he was in the closed area was because he was trying to recover gear that, if left unrecovered, might itself continue to "fish," in derogation of the conservation purposes of the regulations. He should not be punished for his effort to prevent that from happening.

There are two aspects to his argument. First, he says that enforcement of the regulations forbidding entry into a closed area is arbitrary and capricious under the particular circumstances of his case because the regulations in question gave mutually inconsistent commands. Section 648.14(52), for instance, makes it an offense both to "[e]nter" and to "fail to remove gear from" a closed area. Roche contends that he was put in the position of having to violate one or the other of the commands of the regulation. In order to obey the latter command and remove his gear from the closed area, he had to enter the area. Contrariwise, if he refrained from entering the area, he would have failed to remove his gear from the area. No matter what he did, he says, he would have been in violation, and it is unfair—arbitrary and capricious—to punish him for either choice under these circumstances.

As an initial matter, there is a factual flaw in his argument. According to the facts as found by the ALJ, Roche discovered the remains of his missing gear and started hauling it aboard when the vessel was still *outside* the closed area. The regulations' prohibition against failing to remove the gear from the closed area did not apply.

More fundamentally, the argument depends on an overly literal reading of the regulations. The point of the regulations is that closed areas are to be closed to fishing. During the period of closure, vessels may not enter to fish. In addition, any fixed gear that is in place within the area prior to the commencement of the closure must be removed once the closure takes effect. In most cases, it will be recalled, the closures were "rolling" ones that were temporary and of short duration. Written to cover a variety of possible circumstances, the regulations necessarily speak in language general enough to accomplish that purpose. Roche's contention that if and when the renegade gear entered the closed area, he would be in violation of the regulatory command not to "fail to remove" the gear from the zone is,

simply put, a strained and untenable reading of the regulations. He was not in the "Catch–22" situation he proposes.

 He makes a related argument that he should be afforded "equitable" relief from the penalty assessment because by removing renegade gear that might continue to "fish" he was promoting conservation consistent with the purposes of the regulations he was charged with violating. This is, at base, an argument against strict enforcement of the closure regulations. The virtue of strict enforcement of regulatory standards is that there is a "bright line" standard that can easily and efficiently be applied to advance the goals of the regulations. Just as the regulators need not prove intentional or knowing violation, *see Northern Wind,* 200 F.3d at 19, so they need not worry in individual cases about having to refute claims of "good faith" or other worthy purposes. There is no reason to invoke principles of equity to relieve Roche of the finding that he violated the closure regulations by entering the Western Gulf of Maine on February 1, 1999.

### D. *The Amount of the Fine*

Last, Roche argues that the $20,000 penalty assessment is excessive and should not stand. Roche contends both that the amount of the penalty is not supported by the facts of the case and that it violates the Eighth Amendment to the Constitution barring excessive fines. *United States v. Bajakajian,* 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998).

 A penalty of up to $100,000 may be imposed under the Magnuson–Stevens Act for violation of the conservation regulations. 16 U.S.C. § 1858(a). The penalty imposed in this case is well within the statutory range. The record demonstrates that the ALJ took account of all pertinent factual circumstances of the violation. In consideration of the nature, extent and gravity of the prohibited acts, Roche's degree of culpability, and his ability to pay, the ALJ reduced the penalty from $35,000 (as initially set by NOAA) to $20,000. There was plainly sufficient basis in the evidentiary record to support the ALJ's determination that the violation warranted a penalty of $20,000.

 The penalty imposed does not violate the United States Constitution's Excessive Fines Clause. U.S. Const. amend. 8. As the Supreme Court has recently noted, "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian,* 524 U.S. at 334, 118 S.Ct. 2028. A penalty that bears a significant relationship to the seriousness of the offense and is in the lowest quintile of the available range easily satisfies the proportionality test. Protecting and restoring coastal fisheries is an important national goal, one likely to be undermined by imposing too-low assessments and thus encouraging some in the fishing industry to enter closed areas with impunity, figuring to account for fines as just another cost of doing business.

### IV. *Conclusion*

To summarize, under the Magnuson–Stevens Act, Congress authorized the Secretary of Commerce to regulate the Nation's marine fisheries, a critical environmental and economic resource. 16 U.S.C. § 1801(a)(1). Scientific evidence of rapidly deteriorating stocks underscores the urgent need to eliminate overfishing of those stocks, permitting them to repopulate. Amendment 7 to the FMP provides for an abbreviated framework adjustment procedure in lieu of more formal rulemaking

procedures, allowing expeditious response to changing conditions in fish populations. Framework 25 was adopted under this abbreviated procedure. Because of the critical nature of the overfishing problem and the difficulty of monitoring the closed areas, fishermen may be held strictly liable for violation of the regulations.

Framework 25 was properly promulgated, the ALJ's finding Roche liable for entering the closed area is supported by substantial evidence, and the penalty assessment imposed upon the plaintiff is within the range of what is reasonable under all the circumstances. Accordingly, the plaintiff's motion for summary judgment is DENIED and the defendants' motion is GRANTED.

Judgment shall issue affirming the assessment of the penalty.

It is SO ORDERED.