**WESTERN SEA FISHING COMPANY, INC.; f/v Voyager, Inc.; Cape Clam, Inc., Plaintiffs,**

v.

**The Honorable Gary F. LOCKE, Secretary of the United States Department of Commerce, Defendant.**

**Civil Action No. 07–10699–WGY.**

United States District Court, D. Massachusetts.

July 13, 2010.

H. Reed Witherby, Smith & Duggan LLP, Boston, MA, for Plaintiffs.

Lawson E. Fite, Robert P. Williams, U.S. Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This case, at its heart, requires this Court to analyze the conservation goal of fishery management, a matter committed by statute to an executive agency, and then determine whether a group of New England fishermen may continue to fish for herring, the "silver darlings" of song and folklore. The fishermen "caught in the regulatory net"[1] have been denied the necessary permits and will no longer be able to fish for their targeted species.

These fishermen come to this Court seeking to invalidate so much of the Secretary of Commerce's (the "Secretary") final rulemaking which restricted methods for acquiring herring permits.

## I. UNDISPUTED FACTS[2]

### A. The Statutory and Regulatory Scheme

#### 1. The Magnuson–Stevens Act

▇▇▇ The Magnuson–Stevens Fishery Conservation and Management Act (the "Magnuson–Stevens Act" or the "Act"), 16 U.S.C. § 1801 *et seq.*, promulgates a statutory scheme to maximize the nation's fisheries in a sustainable way. *See Little Bay Lobster Co. v. Evans,* 352 F.3d 462, 464–65 (1st Cir.2003). The Secretary, through its designees, the National Marine Fishery Service (the "Fishery Service") and Regional Fishery Management Councils ("Regional Councils"), is charged with implementing the Act. *See* 16 U.S.C. § 1854(a).

These agencies coalesce into a sophisticated administrative collaborative that addresses local fishery management concerns and implements fishing policy in accordance with national standards. *Campanale & Sons, Inc. v. Evans,* 311 F.3d 109, 111 (1st Cir.2002). The Regional Councils, which are each composed of persons with various interests in the region's fisheries, "prepare, monitor, and revise fishery management plans, which will achieve and maintain, on a continuing basis, the opti-

---

1. *See Associated Fisheries of Me., Inc. v. Daley,* 127 F.3d 104, 107 (1st Cir.1997).

2. The Court notes that the Secretary did not submit a statement of material facts as required under Local Rule 56.1, nor did the Secretary cite to page references when refuting the plaintiffs' statement of material facts. The statement of material facts serves the purpose of directing the Court to "what is—and what is not—genuinely controverted" in,

as here, a voluminous administrative record. *See Calvi v. Knox County,* 470 F.3d 422, 427 (1st Cir.2006). The Court, thus, makes its ruling without a clear picture of the controverted facts. One fact is, however, definitely uncontroverted: granting the permit at issue here will not, either immediately or in the foreseeable future, cause overfishing in the herring fishery. (Hr'g Tr. 2–3, Jan. 19, 2010).

mum yield from each fisher[y]." *Id.* (internal quotations omitted). Additionally, Regional Councils "enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of such [fishery management] plans" and "take into account the social and economic needs of the States." *Id.* (quoting 16 U.S.C. § 1801(b)(5)).

■ A Regional Council's primary purpose is to formulate and implement a fishery management plan for each species that requires conservation. 16 U.S.C. § 1801(b)(5). The plan must set forth guidelines for the fishery while conforming with the sustainability and conservation goals of the Act. 16 U.S.C. § 1853(a)(1). Thus, "the Magnuson–Stevens Act's main thrust is to conserve the fisheries as a continuing resource through a mixed federal-state regime; the [plans] are proposed by state Councils but the final regulations are promulgated by the Secretary through the Fisheries Service." *Campanale & Sons,* 311 F.3d at 111 (quoting *Massachusetts v. Daley,* 170 F.3d 23, 27–28 (1st Cir.1999)).

The plan must conform to ten national standards, including national standard 1: "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry," 16 U.S.C. § 1851(a)(1), and national standard 4:

> Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4).

### 2. The Consistency Amendment

In 1999, the New England and Mid–Atlantic Fishery Management Councils developed a plan to homogenize regulations limiting access to certain fisheries[3]—meaning that boats cannot freely enter into the fishery. Fishery Management Plan Amendments to Achieve Regulatory Consistency on Permit Related Provisions for Vessels Issued Limited Access Federal Fishery Permits, 64 Fed. Reg. 8263–01 (Feb. 19, 1999) (to be codified at 50 C.F.R. pts. 648 and 649) (the "Consistency Amendment"). The Consistency Amendment contains a provision that bans permit splitting for the Northeast multispecies limited-access permits. This provision forbids the issuance of a "limited access permit ... to a vessel or its replacement ... if the vessel's permit or fishing history has been used to qualify another vessel for another Federal fishery."[4] *Id.* at 8266.

---

**3.** Summer flounder, scup, black sea bass, Atlantic mackerel, squid, butterfish, Atlantic surf clam, ocean quahogs, Northeast multispecies (cod, haddock, pollock etc.), sea scallops, and American lobster fisheries were subject to the Consistency Amendments. 64 Fed. Reg. 8263–01, 8263 (Feb. 19, 1999) (to be codified at 50 C.F.R. pts. 648 and 649).

**4.** The Consistency Amendment also contained a provision called the "qualification restriction," which states: "Unless the Regional Administrator determines otherwise, no more than one vessel may qualify, at any one time, for a limited access permit ... based on that or another vessel's fishing and permit history." *Id.* at 8265–66. The parties did not articulate clearly how the qualification restriction is different from the permit-splitting ban to ensure that neither provision is superfluous. This Memorandum and Order focuses on the permit-splitting provision because the

The permit-splitting ban states that if a vessel acquired its permit via permit splitting it would no longer "remain valid." *See id.* Once the Consistency Amendment became effective, the permit-splitting ban was incorporated into the regulations for the identified fisheries-Atlantic herring, however, was not one of the identified fisheries at that time. *See, e.g.,* 50 C.F.R. § 648.4(a)(1)(i)(L), (a)(2)(i)(L), (a)(2)(ii)(N), (a)(3)(i)(L), (a)(4)(i)(L).

### 3. The 1999 Herring Plan

The Atlantic herring, *Clupea harengus,* a pelagic fish species, supports a commercial fishery along the Atlantic Coast of the United States and Canada. Atlantic Herring Fishery Management Plan, 64 Fed. Reg. 50,266, 50,267 (proposed Sept. 16, 1999) (to be codified at 50 C.F.R. pt. 648). In 1999, the New Regional Council proposed a plan to implement measures to the herring fishery, noting that despite record high "there appears to be sufficient harvesting capacity to [ ] concern about excess harvesting capacity entering the in all proposed management areas." *Id.* The New England Council's proposed plan (the "1999 Herring Plan") became effective on December 11, 2000, with certain amendments becoming effective on January 10, 2001. Atlantic Herring Fishery Management Plan, 65 Fed. Reg. 77,450, 77,450 (Dec. 11, 2000) (to be codified at 50 C.F.R. pts. 600 and 648). In particular, the 1999 Herring Plan:

> include[d] administrative and management measures to ensure effective and sustainable management of the herring resource. The Plan establishe[d] Total Allowable Catches (TACs) for each of four management areas as the primary control on fishing mortality. . . . Other elements of the Plan included requirements for vessel, dealer, and processor permits as well as reporting require-

ments and restrictions on the size of vessels that can take, catch, or harvest herring.

New England Fishery Mgmt. Council, *Draft Am. 1 to the Fishery Management Plan for the Atlantic Herring* 3 (August 4, 2005) (the "Draft Amendment 1"). The 1999 Herring Plan limited total catch through hard quotas, whereby "X"-tons could be removed from the fishery and no more; entrance into the fishery, however, was open to all vessels that met certain eligibility criteria. Atlantic Herring Fishery Mgmt. Council, 65 Fed. Reg. at 77,-451–52. The optimum yield for the herring fishery was set at 224,000 metric tons. *Id.* at 77,451, Table 1. In ensuring that the regulation met national standard 1's requirement of achieving the optimum yield on a continuing basis, the Total Allowable Catch was set at this level. *Id.* at 77,451, Table 2. Despite the fact that actual herring landings never reached optimum yield, averaging 103,417 metric tons from 2000 through 2004, Draft Amendment 1 at 246, the optimum yield was lowered to 150,000 metric tons for 2005 and 2006, Atlantic Herring Fishery, 70 Fed. Reg. 21,971, 21,972 (Apr. 28, 2005) (to be codified at 50 C.F.R. pt. 648). Even with the lowered optimum yield, the fishery was still underfished with total herring landings at approximately 62% of optimum yield in 2005. *See* New England Fishery Management Council, Final Am. 1 to the Fishery Management Plan for the Atlantic Herring 275, Table 35 (the "Final Amendment 1") (May 6, 2006).

The final rule implementing the 1999 Herring Plan is devoid of any reference to the Consistency Amendments, as the herring fishery was not a limited access fishery under the plan.

denial of Cape Clam's limited access permit was based on that provision.

### 4. The 2005 Amendment

In 2005, the New England Council sought to amend the 1999 Herring Plan. At that time, it articulated two main purposes for the modification of the fishery's management: 1) "[to] [c]onsider[ ] limited or controlled access in the herring fishery" and 2) "[to] [i]ncorporat[e] new stock assessment information as appropriate." Draft Amendment 1 at 6.

As part of its proposed limited access fishery, whereby specific criteria control the number of permits for the Atlantic Herring Fishery, the New England Council proposed a rule regarding permit splitting that would incorporate the understanding of permit splitting formulated in the Consistency Amendment. *See id.* at 17. Specifically, the provision stated:

> The [C]onsistency [A]mendment established a measure that requires limited access permits issued to a vessel to stay together with the vessel as a "package." They may not be split apart and distributed among other vessels by making a vessel replacement because that would increase overall fleet capacity. Therefore, all limited access permits must be treated as a "package" for the purposes of vessel replacement, or for the purposes of limited access permit retention when a vessel is sold or transferred. The Atlantic herring limited access program would adopt this restriction upon implementation.
>
> This provision is intended to prevent an increase in fishing effort and capitalization. Otherwise, through the use of permit splitting, overall fleet capacity may increase, thereby negating the benefits gained from other management measures.

*Id.*

After the Draft Amendment 1 was proposed, the Fishery Services fielded numerous questions regarding eligibility for limited access permits. *See, e.g.,* Letter from National Marine Fishery Service to Federal Vessel Permit Holders (Feb. 17, 2006) ("Some vessel owners have asked about the limited entry eligibility criteria adopted for the Atlantic herring fishery by the New England Council in [the Draft Amendment 1].");  Letter from National Marine Fishery Service to Atlantic Herring Permit Holders (Mar. 28, 2006) (requesting that the New England Council clarify its intent regarding the permit splitting ban).

The final version of the amendment incorporated the permit splitting ban articulated in the proposed draft. *See* Final Amendment 1 at 20. The Final Amendment 1 also "appli[ed] [the permit splitting ban] to the transfer/sale of herring fishing history prior to the implementation of [the Draft Amendment 1]." Final Amendment 1 at 20.

The Secretary approved the Final Amendment 1 and published it as a final rule on March 12, 2007 (the "Final Rule"). The Final Rule, stated:

> [A] limited access permit may not be issued to a vessel if the vessel's permit or fishing history has been used to qualify another vessel for a limited access permit. This means all limited access permits, including herring limited access permits, must be transferred as a package when a vessel is replaced or sold. As specified in Amendment 1, the permit-splitting provision applies to the transfer/sale of herring fishing history prior to the implementation of this final rule. Thus, vessel owners who sold vessels with limited access permits and retained the herring history with the intention of qualifying a different vessel for the herring limited access program are not eligible for a limited access permit, unless the limited access permits on

the sold vessel are permanently relinquished by the owner.

Atlantic Herring Fishery, Amendment 1, 72 Fed. Reg. 11,252, 11,255 (Mar. 12, 2007) (codified at 50 C.F.R. § 648.4(a)(10)(iv)(N)).

### B. Cape Clam's Purchase of Herring Fishing Histories

The plaintiffs, Western Sea Fishing Co. Inc., F/V Voyager, Inc., F/V Challenger, Inc., F/V Endeavour, Inc., and Cape Clam, Inc. ("Cape Clam"), brought this action against the Secretary on April 11, 2007, seeking to invalidate the newly adopted Final Rule to the extent that it disqualified otherwise qualifying herring histories from obtaining a limited access herring permit if the herring history had been separated from the vessel's limited access permits in other fisheries. In particular, the plaintiffs sought to invalidate the provision to the extent that it covered sales of herring histories prior to the adoption of the Final Rule—a retroactive application of the permit-splitting ban. The plaintiffs, with claims based on the Magnuson–Stevens Act, the Fifth Amendment to the United States Constitution, and the Regulatory Flexibility Act, moved for summary judgment on February 29, 2008. Pls.' Mot. Summ. J. The Secretary responded on March 28, 2008, and moved for summary judgment based on ripeness because no plaintiff had been denied a permit at that time. Def.'s Cross Mot. Summ. J. at 10. During the oral hearing on April 23, 2008,

the Plaintiffs stipulated to the dismissal of Fishing Vessels Challenger and Endeavour, each of which had been granted limited access herring permits. This Court then terminated the motions for summary judgment and administratively closed the case on ripeness grounds. Order Administratively Closing Case, Apr. 22, 2008. The Court instructed that "the case may be reopened by motion by either party once a claimant is denied a permit or a different regulatory system makes things moot." *Id.*

Plaintiffs Cape Clam, Western Sea Fishing Company, Inc., and F/V Voyager, Inc. moved to reopen the case on September, 4 2009, and this Court granted the motion on September 9, 2009. Order Granting Mot. Reopen Case, Sept. 9, 2009. In addition, this Court granted Cape Clam, Western Sea Fishing Company, Inc., and F/V Voyager, Inc.'s emergency motion for leave to file a supplemental complaint pursuant to Federal Rule of Civil Procedure 15(d). Order Granting Emergency Mot. Leave File Supplemental Compl., Sept. 10, 2009. As the supplemental complaint alleged new causes of action, the Court ordered a stay regarding the supplemental claims and a prompt hearing regarding the original claim. Order Granting Mot. Stay Amended Complaint and Hearing Original Claim, Oct. 13, 2009.

■■■ This Memorandum and Order only deals with the original challenge to the Final Rule.[5] Currently, only Cape Clam is

---

5. Cape Clam complains that the Final Rule violates the Regulatory Flexibility Act, 5 U.S.C. § 601, *et seq.*, and constitutes a taking in violation of the Fifth Amendment of the United States Constitution. The only reference to these allegation, however, are in the complaint. The motion for summary judgment did not raise either issue. As the First Circuit stated:

> Few principles are more sacrosanct in this circuit than the principle that issues advert-

ed to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. As a corollary to this principle, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.

*Redondo–Borges v. U.S. Dept. of Hous. and Urban Dev.*, 421 F.3d 1, 6 (1st Cir.2005) (internal citations and quotations omitted). Accordingly, Cape Clam has waived its Regula-

before the Court as the only plaintiff who has been denied a limited access herring permit and exhausted its administrative remedies.

In open access fisheries—fisheries where the Consistency Amendment does not apply—the fishing permits, the fishing history, and the vessel are separate entities and can be purchased separately or together. *Cf. Arctic King Fisheries, Inc. v. United States,* 59 Fed.Cl. 360, 377 (2004). Therefore, a quasi-market is created in anticipation of a specific fishery becoming a limited access fishery. In other words, if a fisherman anticipates that a fishery will become a limited access fishery with permits based on certain prerequisites, he could purchase the required documentation from another boat prior to the creation of the limited access fishery, even if he did not purchase the boat itself.

Cape Clam, in anticipation that some of its vessels would not qualify for a permit once the herring fishery became limited access, entered into a "history transfer" with F/V Glacier Bay ("Glacier Bay"). Reichle Aff. ¶ 5, Feb. 29, 2008. Cape Clam and Glacier Bay structured this transaction so that Cape Clam purchased Glacier Bay's herring and mackerel catch histories and Glacier Bay retained the vessel and its limited access permits. *Id.; see also* Supplemental Mem. Supp. Mot. Summ. J. Ex. 1, Mem. re: Appeal—F/V Crystal Ann, Permit No. 410197 at 1 (May 26, 2009) (the "Permit Appeal"). Before the "history transfer," Cape Clam spoke with the Fishery Service regarding the transaction, and was told that the transfer was valid. Reichle Aff. ¶ 6. Cape Clam and Glacier Bay notified the Fishery Service of the consummated transaction by letter dated May 27, 2005. *Id.*

After the Final Rule came into effect, Cape Clam was denied its limited access herring permit and thereupon appealed this ruling. Concluding that the information used to deny the permit was based on incorrect data, the hearing officer granted the appeal. The Permit Appeal at 1. The Regional Administer, however, disagreed with the hearing officer's findings, and again denied the permit application. Supplemental Mem. Supp. Mot. Summ. J. Ex. 2, Decision Mem. re: Herring Appeal Determination for F/V Crystal Ann, Permit No. 410197 at 1 (Aug. 13, 2009).

## II. ANALYSIS

In seeking invalidation of the Final Rule to the extent that it applied the permit-splitting ban retroactively, Cape Clam argues that the Secretary's interpretation and application of the permit-splitting ban was arbitrary and capricious, and thus in violation of the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.* (the "APA").

### A. Standard of Law

██ Cape Clam asks this Court to declare the Final Rule unlawful in its application of the permit-splitting ban, and to permanently enjoin that application. The Secretary's action may be set aside under the APA, if such action is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Therefore, this Court must determine if the Secretary's action "was consonant with [the agency's] statutory powers, reasoned, and supported by substantial evidence in the record." *Associated Fisheries of Me., Inc.,* 127 F.3d at 109. When evaluating these factors, this Court must only consider the information available to the agency at the time it took action. *See Valley Citizens for a Safe*

tory Flexibility Act and Fifth Amendment Takings Clause arguments.

*Env't v. Aldridge*, 969 F.2d 1315, 1319 (1st Cir.1992).

■■■ The burden lies with the party challenging the regulation to demonstrate that the regulation fails to comply with the APA. *M/V Cape Ann v. United States*, 199 F.3d 61, 63 (1st Cir.1999). Moreover, judicial review under the arbitrary and capricious standard is highly deferential, and the agency's final determination is afforded a presumption of validity. *River Street Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir.2009). This is especially true in a technical and complex regulatory schema, such as fisheries management. *See National Fisheries Inst. Inc. v. Mosbacher*, 732 F.Supp. 210, 223 (D.D.C.1990) ("It is ... especially appropriate for the Court to defer to the expertise and experience of those individuals and entities—the Secretary, the Councils, and their advisors— whom the [Magnuson–Stevens] Act charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors.") In light of the deferential treatment this Court affords to the Secretary's implementation of the Act, this Court may not substitute its judgment for that of the agency's and will uphold the decision if it "do[es] not collide directly with substantive statutory commands." *Adams v. E.P.A.*, 38 F.3d 43, 49 (1st Cir.1994).

■■■ Judicial review of administrative actions, however, is not a mere rubber stamp. *Federal Labor Relations Authority v. Aberdeen Proving Ground, Dept. of the Army*, 485 U.S. 409, 414, 108 S.Ct. 1261, 99 L.Ed.2d 470 (1988) (per curiam). Regulations cannot survive judicial scrutiny "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Bluntly put, the information used and the regulation rendered "must make sense to reviewing courts." *Puerto Rico Sun Oil Co. v. U.S. E.P.A.*, 8 F.3d 73, 77 (1st Cir.1993).

**B. Coordination with the Consistency Amendment**

■■■ Cape Clam argues that the interpretation and application of the permit-splitting ban in the Final Rule is inconsistent with the application of those provisions in the Consistency Amendment. Cape Clam's argument is that the Secretary is applying these provisions retroactively for the first time. Pls.' Mem. Supp. Summ. J. at 18–22. Thus, Cape Clam contends that the Secretary was arbitrarily applying the permit-splitting ban retroactively to the herring fishery inconsistent with the Secretary's actions regarding other fisheries.

■■■ While a retroactive application of the permit-splitting ban for the herring fishery may be literally arbitrary when compared to other fisheries, a literally arbitrary application does not necessarily satisfy the "arbitrary and capricious" standard of the APA. This Court cannot set aside "an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs.*, 463 U.S. at 42, 103 S.Ct. 2856.

■■■ A limited access fishery is one of the tools that can be used to meet the goal of conservancy. The New England Coun-

cil explained in the Draft Amendment 1 that the permit-splitting provision furthers the goals of conservation by "prevent[ing] an increase in fishing effort and capitalization." Draft Amendment 1 at 17. By not recognizing permits acquired via permit splitting, fewer boats are available to utilize the resource and, therefore, both effort and capitalization do not increase. The purpose for the interpretation and application of the permit-splitting ban in the Final Rule—to prevent an increase in fishing effort and capitalization—is a rationally related means of achieving the goal of conservancy. *See Conservation Law Found. v. Evans,* 360 F.3d 21, 27 (1st Cir.2004). While there may have been other ways to achieve this goal, this Court should not substitute its judgement for the agency. *Adams,* 38 F.3d at 49. "Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. E.P.A.,* 540 U.S. 461, 497, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) (internal quotation marks omitted).

## C. 16 U.S.C. § 1853(b)(6)

▇ Cape Clam argues that the permit-splitting ban is arbitrary and capricious because the Regional Council failed to consider any of the requirements for formulating fishery management plans under the Magnuson–Stevens Act, 16 U.S.C. § 1853(b)(6). The Magnuson–Stevens Act requires that when establishing a limited access system for a fishery:

> the Council and the Secretary take into account: (A) present participation in the fishery; (B) historical fishing practices in, and dependence on, the fishery; (C) the economics of the fishery; (D) the capability of fishing vessels used in the fishery to engage in other fisheries; (E) the cultural and social framework relevant to the fishery and any affected fishing communities; (F) the fair and equitable distribution of access privileges in the fishery; and (G) any other relevant considerations.

16 U.S.C. § 1853(b)(6). In particular, Cape Clam argues that the New England Council did not consider the effect on local fishing communities, nor the abilities of the fishermen to engage in other fisheries. Pls.' Mem. Supp. Summ. J. at 29.

Cape Clam reads too much into the requirements of the Magnuson–Stevens Act. The New England Council satisfied its obligations when it described the relationship of the fisheries and the local fishing communities in the Draft Amendment 1. *See* Draft Amendment 1 at 475–89, 523–30, 582–87. The Council described the community of Cape May accordingly: "Today, commercial fishing is still the backbone of the county and is the second largest industry in Cape May County. The port of Cape May is considered one of the largest and busiest seaports along the eastern seaboard and generates more than $500 million annually." *Id.* at 523. Additionally, the Draft Amendment 1 described Cape May as having an ideal locale for buying and selling seafood due to well managed infrastructure and proximity to transportation hubs. *Id.* at 528. Lastly, the Draft Amendment 1 found that in 2002, the dollar value of herring landings in Cape May was $55,871, and the total dollar value of herring landing between 1997–2003 was $924,648. *Id.* at 529.

The Council described the Gloucester fishing industry as relatively strong "in terms of recently reported landings. Gloucester's commercial fishing industry had the 13th highest landings in pounds (78.5 million) and the nation's ninth highest landings value in 2002 ($41.2 million)." *Id.* at 483. Gloucester's herring landing was

valued at approximately $200,000 in 2002 and totaled $20,000,000 between 1997–2002. *Id.* at 485.

The Council also considered the impact a limited access fishery would have on non-qualifying vessels. The Council stated:

> These ... vessels average up to 90 days-at-sea per year (as many as 170 days for one of the vessels) and have average yearly revenue from herring of $342,031. On average, herring provides 73% of total revenue and mackerel provides 28% for these vessels. The economic impact to these four vessels of not qualifying for any of the limited access directed fishery permits would be significant. Mackerel is a short season fishery, and these vessels are rigged for pelagic fishing. Unless market conditions change, fully replacing revenue lost from herring fishing with revenue from mackerel is unlikely. Also, it would be costly to switch to other fisheries, so it is likely these vessels would have to consider relocating. The freezer plants would be impacted by the loss of these vessels.

*Id.* at 614.

Thus, prior to the meeting, the Council understood the impact Amendment 1 would have on non-qualifying vessels. While these issues were not discussed at the meeting, the New England Council satisfied the Magnuson–Stevens Act by considering "the capability of fishing vessels used in the fishery to engage in other fisheries" and "the cultural and social framework relevant to the fishery and any affected fishing communities." Therefore, in implementing the permit-splitting ban, the agencies involved did comply with the Magnuson–Stevens Act's requirements for establishing limited access fisheries.

### D. The National Standards

In promulgating the plans governing the fisheries, the Secretary must conform to the Act's ten national standards. 16 U.S.C. § 1851(a). Here, Cape Clam argues that the permit-splitting ban does not conform to national standards 1 and 4.

#### 1. National Standard 4

■ Cape Clam argues that the Final Rule violates the "fair and equitable" provision of national standard 4. 16 U.S.C. § 1851(a)(4). Understandably, the fishermen who cannot obtain permits will feel they were treated unfairly; their plight, however, does not rise to the legal definition of unfairness established by the Secretary through his regulations.

Cape Clam argues that applying the permit-splitting ban retroactively was unfair because there was significant confusion about such an application, it was a new application that disqualified fishing vessels that had purchased histories relying on old interpretations, and there was no reason to apply the ban retroactively when regulating a healthy fish population. Pls.' Mem. Supp. Mot. Summ. J. at 28–29.

■ In applying national standard 4, "the Secretary is permitted 'to sacrifice the interests of some groups of fishermen, for the benefit ... of the fishery as a whole.'" *Roche v. Evans,* 249 F.Supp.2d 47, 56 (D.Mass.2003) (O'Toole, J.) (quoting *Alliance Against IFQs v. Brown,* 84 F.3d 343, 350 (9th Cir.1996)). Courts are loath "to second-guess the Secretary's judgment simply because the provisions of a Fishery Management Plan or a plan allocation have a greater impact upon one group or type of fishermen." *Van Valin v. Locke,* 628 F.Supp.2d 67, 74 (D.D.C.2009) (quoting *North Carolina Fisheries Ass'n v. Gutierrez,* 518 F.Supp.2d 62, 89 (D.D.C.2007)). In essence, the Secretary's broad judgment in weighing the ten national stan-

dards requires the Secretary only to give "a reason for doing that which was consistent with the statutory standards." *Alliance Against IFQs*, 84 F.3d at 350.

Here, the New England Regional Council and the Secretary thoroughly evaluated both the communities and industries, and the impact that the amendment would have on them. *See* the Final Amendment 1 at 261–450, 508–626 (detailing all employers, ports, and potential impacts Amendment 1 may cause). The New England Council, in the Final Amendment 1, stressed the fear that relying on hard quotas would increase "derby fishing," where a large amount of the resource is removed very quickly, in other words a race to reach the vessel's quota before the fishery is closed for fishing. *Id.* at 511. Limiting the number of vessels, and thus controlling the fishing capacity, "could mitigate the potential for negative impacts on community dynamics and cultural traditions." Final Amendment 1 at 512. These stated reasons regarding protection of the fishery as a whole, provide sufficient justification to satisfy nation standard 4, despite any inequitable application.

### 2. Nation Standard 1

■ The plaintiffs argue that since herring are not overfished and that the total catch is below the optimum yield, the regulation against permit splitting violates national standard 1 of the Act. Pls.' Mem. Supp. Mot. Summ. J. at 24–28. The Secretary contends that the regulation is not intended to protect current optimum yield, admitting that there is no current danger of overfishing. *See* Hr'g Tr. 3, 5–8, Jan.

19, 2010. Instead, the Secretary acted to prospectively prevent problems that could occur in the future from excess fleet capacity. Def.'s Opp'n and Cross–Mot. for Summ. J. at 29–30. Moreover, the Secretary argues that it is protecting the overfishing of other fisheries through the retroactive application of the permit-splitting ban.[6] *Id.* at 21.

These arguments present two conflicting visions of the statutory scheme envisioned by the Magnuson–Stevens Act. The central questions differentiating them are whether the Secretary is empowered to make regulations to protect future optimum yield when that fishery is not presently in danger of being overfished, and whether the Secretary can regulate for the good of all fisheries without regard to meeting the optimum yield of any single fishery.

■ The first question a court must ask when looking at an agency interpretation of a statute is whether Congress has spoken on that issue. *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Here, Congress has spoken. "The bedrock principle of National Standard 1 is that conservation and resource management measures ... 'shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.'" *Associated Fisheries of Me., Inc.*, 127 F.3d at 111 (quoting 16 U.S.C. § 1851(a)(1)). The optimum yield is the amount of fish which:

---

**6.** For example, suppose a fishing vessel had qualifying histories for Atlantic mackerel, butterfish, and herring (to the extent such a combination is possible) and subsequently sold its herring history. If that fishing vessel could still qualify for Atlantic mackerel and butterfish limited permits, it could devote more resources to catching those fish if it no longer fished for herring. In addition, the fishing vessel that purchased the herring fishery may not have any other permits such that it could devote all of its resources to fishing herring. The two boats will likely land more Atlantic mackerel, butterfish, and herring in a given year than the original fishing vessel would have landed.

(A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by an relevant social, economic, or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield on a continuing basis.

16 U.S.C. § 1802(33). This standard is one intended to guarantee food production and recreational use. Congress has defined overfishing as "a level or rate of fishing mortality that jeopardizes the long-term capacity of a stock or stock complex to produce maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(34). Both of these definitions depend on the "maximum sustainable yield"—a term that is not defined in the Magnuson–Stevens Act. The legislative record, however, indicates that "maximum sustainable yield" refers to a scientific appraisal of "the safe upper limit of harvest which can be taken consistently year after year without diminishing the stock so that the stock is truly inexhaustible and perpetually renewable." H.R.Rep. No. 94–445, at 48 (1975).

Had Congress charged the Secretary with merely preventing overfishing, the Secretary likely would have responded with eliminating fishing altogether. On the other end of the spectrum, if Congress had charged the Secretary with obtaining the optimum yield from each fishery, with no "continuing basis" language, the Secretary likely would have responded with regulations that encouraged fishing to the limit of each species. Instead, Congress requires that the Secretary perform a balancing act. The language "on a continuing basis" creates a duty to allow for harvesting at optimum yield in the present, while at the same time protecting fishery output for the future, consistent with Congress' intention that fisheries be preserved for food production and recreational use.

Moreover, national standard 1 charges the Secretary with preventing overfishing and achieving the optimum yield for **each** fishery. The Court understands that the Secretary has a complex task in managing the many fisheries, but the consideration of protecting other fisheries should be part of the analysis in setting optimum yield. Congress intended optimum yield to be based on the scientific analysis of maintaining a consistent stock "as modified by relevant economic, social, or ecological factors."

The Secretary's arguments as to how the retroactive permit-splitting ban relates to national standard 1 are based on erroneous understandings of national standard 1. While the Secretary is correct to the extent that national standard 1 requires consideration of maintaining a health fishery, any such analysis should be used in setting the appropriate optimum yield. Once optimal yield is set, the Secretary is charged with "achieving" the optimum yield. Here, the evidence demonstrates that the herring landings have been consistently below the optimum yield, and well below the optimum yield, since 1999. The justification for refusing to grant Cape Clam a license is not rationally related to achieving optimum yield when there is simply no evidence or contention of a current danger of overfishing. Indeed, the justification seems likely to exacerbate the gap between landings and optimum yield. In addition, maintaining landings well below optimum yield in one fishery as a means of preventing overfishing in other fisheries does not comport with national standard 1 as again, such a concern should

be reflected in the analysis when setting the optimum yield.

The Secretary has not advanced sufficient reason to uphold this permit-splitting ban as applied to Cape Clam, and the reasons presented run contrary to national standard 1. This is not to say that in other cases where the regulation can be shown to have a relation to achieving the optimum yield from a fishery, either immediately or in the near future, the Secretary will have violated the standard. In this case, however, it is clear that there is no such relation, and therefore this regulation, as applied here, cannot be upheld.

## III. CONCLUSION

Accordingly, summary judgment shall enter for Cape Clam, as the retroactive application of the permit-splitting ban as applied here, resulting in the denial of Cape Clam's limited access herring permit, violated national standard 1 of the Magnuson–Stevens Act, 16 U.S.C. § 1851(a)(1). On all other claims, summary judgment shall enter for the Secretary.

SO ORDERED.